**No. 26-12073**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**CA, INC., d/b/a CA TECHNOLOGIES**
**(A BROADCOM COMPANY),**

*Plaintiff-Appellant,*

v.

**DELTA AIR LINES, INC.,**

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
No. 1:25-cv-00489-ELR (Hon. Eleanor L. Ross)

---

# BRIEF OF APPELLANT CA, INC.

---


Alison L. Plessman
Justin M. Greer
Abraham Weiss
Hueston Hennigan LLP
523 W 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4542
aplessman@hueston.com
jgreer@hueston.com
aweiss@hueston.com

Michael A. Caplan
Ashley C. Brown
Erin M. Victoria
Caplan Cobb, LLC
75 14th Street NE, Suite 2700
Atlanta, GA 30309
(404) 596-5600
mcaplan@caplancobb.com
abrown@caplancobb.com
evictoria@caplancobb.com

*Counsel for Plaintiff-Appellant CA, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

CA respectfully requests oral argument. This appeal presents important issues (including at least one issue of first impression) regarding the intersection of federal copyright law and software licensing agreements that may affect an entire industry engaged in the licensing of enterprise software. The opportunity for oral argument would allow counsel to address these important issues, respond to any questions from the Court, and aid in the Court's decision-making.

**TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF CITATIONS .......................................................................... v

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF THE ISSUES ................................................................. 2

INTRODUCTION ..................................................................................... 3

STATEMENT OF THE CASE .................................................................. 6

I. The License Framework and the Authorized Use Limitation ........................................................................... 6

II. Delta's Overuse and the Notice of Infringement .................... 8

III. Proceedings Below ........................................................................ 9

STANDARD OF REVIEW ........................................................................ 10

SUMMARY OF THE ARGUMENT ......................................................... 10

ARGUMENT AND CITATIONS OF AUTHORITY ................................. 17

I. The District Court Applied the Wrong Legal Test: Use That Exceeds a License's Numerical Limitation Is Infringement Without Regard to Condition or Covenant Language .......... 17

II. Even Under the Condition or Covenant Framework, the Authorized Use Limitation in Delta's Agreements Is a Condition .......... 26

A. The MLA and Order Forms condition the license on the numerical limitation. .......... 26

B. The Order Forms' payment provision confirms that Delta's use rights were conditioned on what it purchased. .......... 39

1. The district court correctly construed the Order Forms to expressly condition Delta's use rights on timely payment. .......... 39

2. Because the scheduled payments are measured in devices, the payment condition reaches the Authorized Use Limitation .......... 41

3. Delta never paid for the excess devices, so its deployment on those devices fell outside the scope of the license. .................................................... 43

III. Dismissal on the Pleadings Was Independently Erroneous Because Rule 12(b)(6) Does Not Permit Interpreting Ambiguous Contract Language Against the Pleader ........... 46

IV. At a Minimum, the Court Should Vacate the District Court's Dismissal with Prejudice ..................................................... 50

CONCLUSION ........................................................................ 51

CERTIFICATE OF COMPLIANCE ..................................................... 53

CERTIFICATE OF SERVICE................................................................ 54

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Actian Corp. v. AutoClerk, Inc.*

2026 WL 974507 (N.D. Cal. Apr. 10, 2026)........................................20

*Ainsworth v. Perreault*

563 S.E.2d 135 (Ga. Ct. App. 2002)....................................................47

*Allen v. Sea Gardens Seafood, Inc.*

723 S.E.2d 669 (Ga. 2012) ...............................................................14, 27

*Ashcroft v. Iqbal*

556 U.S. 662 (2009)..................................................................................10

*Atkins v. Fischer*

331 F.3d 988 (D.C. Cir. 2003)................................................................18

*Audio Sys. of Fla., Inc. v. Simplexgrinnell LP*

2003 WL 22830002 (M.D. Fla. July 14, 2003) ...................................30

*Ausborn v. Ill. Union Ins. Co.*

2024 WL 1896414 (N.D. Ga. Mar. 29, 2024), *aff'd*, 2024 WL 4976324 (11th Cir. Dec. 4, 2024).........................................................................47

*Bates v. JPMorgan Chase Bank, NA*

768 F.3d 1126 (11th Cir. 2014) .................................................... 26, 36

*Bell Atl. Corp. v. Twombly*

550 U.S. 544 (2007) ........................................................................... 10

* *BioHealth Med. Lab'y, Inc. v. Cigna Health & Life Ins. Co.*

706 F. App'x 521 (11th Cir. 2017) .......................................... 16, 42, 50

* *Blue Ridge Apartment Co. v. Telfair Stockton & Co.*

54 S.E.2d 608 (Ga. 1949) ..................................................... 13, 26, 36

*Brittney Gobble Photography LLC v. Wenn Ltd.*

2017 WL 10188859 (E.D. Tenn. Sept. 5, 2017) ................................. 21

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*

116 F.3d 1364 (11th Cir. 1997) ........................................................... 46

*CBS, Inc. v. PrimeTime 24 Joint Venture*

76 F. Supp. 2d 1333 (S.D. Fla. 1998) ................................................. 22

*Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*

541 S.E.2d 435 (Ga. Ct. App. 2000) ................................................... 40

*CMAX/Cleveland, Inc. v. UCR, Inc.*

804 F. Supp. 337 (M.D. Ga. 1992) ...................................................... 22

*D.I. Corbett Elec., Inc. v. Venture Constr. Co.*

231 S.E.2d 536 (Ga. Ct. App. 1976) .................................................. 41

*Dillard v. Manhattan Life Ins. Co.*

44 Ga. 119 (1871) ........................................................................ 15, 49

*Emanuel Tractor Sales, Inc. v. Dep't of Transp.*

571 S.E.2d 150 (Ga. Ct. App. 2002) ....................................... 13, 31, 48

*Fairview Health Servs. v. Quest Software, Inc.*

2021 WL 679260 (D. Minn. Feb. 22, 2021) ....................................... 20

*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*

661 F.2d 479 (5th Cir. Unit B Nov. 1981) ............. 9, 15, 23, 27, 43, 44

*Fulton Cnty. v. Collum Props., Inc.*

388 S.E.2d 916 (Ga. Ct. App. 1989) ............................................. 16, 49

*F.W. Woolworth Co. v. Contemp. Arts, Inc.*

344 U.S. 228 (1952) ........................................................................ 25

*Ga.-Pac. Corp. v. Lieberam*

959 F.2d 901 (11th Cir. 1992) ........................................................... 47

*GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*

131 F. Supp. 3d 1291 (M.D. Fla. 2015) .............................................. 30

*Jacob Maxwell, Inc. v. Veeck*

110 F.3d 749 (11th Cir. 1997)........................................................15, 44

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*

399 F. Supp. 3d 120 (S.D.N.Y. 2019)...........................................12, 20

*Krist v. Scholastic, Inc.*

415 F. Supp. 3d 514 (E.D. Pa. 2019) .................................................40

* *Latimer v. Roaring Toyz, Inc.*

601 F.3d 1224 (11th Cir. 2010)......................................................11, 17

*Live Face on Web, LLC v. Emerson Cleaners, Inc.*

66 F. Supp. 3d 551 (D.N.J. 2014) ......................................................30

*Massih v. Jim Moran & Assocs., Inc.*

542 F. Supp. 2d 1324 (M.D. Ga. 2008) ..............................................26

*MCA Television Ltd. v. Public Int. Corp.*

171 F.3d 1265 (11th Cir. 1999)...........................................................18

*McDuffie v. Criterion Cas. Co.*

449 S.E.2d 133 (Ga. Ct. App. 1994)...................................................40

* *MDY Indus., LLC v. Blizzard Entm't, Inc.*

629 F.3d 928 (9th Cir. 2010)..........................................................12, 19

*Michael Grecco Prods., Inc. v. RGB Ventures, LLC*

2017 WL 4077045 (M.D. Fla. Sept. 14, 2017) .................................... 22

* *Munford, Inc. v. Citizens & S. Nat'l Bank*

258 S.E.2d 766 (Ga. Ct. App. 1979) ...................... 13, 14, 26, 28, 37, 40

*Pac. Stock, Inc. v. Pearson Educ., Inc.*

927 F. Supp. 2d 991 (D. Haw. 2013) .................................................. 12

* *Pargar, LLC v. CP Summit Retail, LLC*

730 S.E.2d 136 (Ga. Ct. App. 2012) ............................ 13, 27, 28, 36, 43

*Sasser & Co. v. Griffin*

210 S.E.2d 34 (Ga. Ct. App. 1974) .................................................... 37

*Sheridan v. Crown Cap. Corp.*

554 S.E.2d 296 (Ga. Ct. App. 2001) .................................. 13, 32, 48, 49

* *Sohm v. Scholastic Inc.*

959 F.3d 39 (2d Cir. 2020) ................................................ 32, 33, 34, 35

*S.O.S., Inc. v. Payday, Inc.*

886 F.2d 1081 (9th Cir. 1989) ................................................ 14, 18, 38

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*

421 F.3d 1307 (Fed. Cir. 2005) .......................................................... 19

*Taylor v. Meirick*

712 F.2d 1112 (7th Cir. 1983)............................................................24

* *Tims v. LGE Cmty. Credit Union*

935 F.3d 1228 (11th Cir. 2019)........................................15, 46, 47, 48

*U.S. Fid. & Guar. Co. v. Gillis*

296 S.E.2d 253 (Ga. Ct. App. 1982)...................................................47

*Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*

882 F.3d 1033 (11th Cir. 2018)..........................................................10

*Vratsinas Constr. Co. v. Triad Drywall, LLC*

739 S.E.2d 493 (Ga. Ct. App. 2013)...................................................41

*Warner Chappell Music, Inc. v. Nealy*

601 U.S. 366 (2024)............................................................................33

*Wolverine Ins. Co. v. Sorrough*

177 S.E.2d 819 (Ga. Ct. App. 1970)...................................................40

*Yellow Pages Photos, Inc. v. YP, LLC*

856 F. App'x 846 (11th Cir. 2021)......................................................24

*Yellowpages Photos, Inc. v. YP, LLC*

418 F. Supp. 3d 1030 (M.D. Fla. 2019) ..................................9, 23, 35

**Statutes**

17 U.S.C. § 106 .......... 17, 36

* 17 U.S.C. § 501 .......... 1, 9, 17

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1338(a) .......... 1

* O.C.G.A. § 13-2-2(4) .......... 13, 31, 48

O.C.G.A. § 13-3-4 .......... 26, 43

O.C.G.A. § 44-6-41 .......... 49

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 1

Fed. R. Civ. P. 12(b)(6) .......... 10, 15, 46, 47, 48

**Other Authorities**

3 Nimmer on Copyright § 10.14[A][2] .......... 21

3 Nimmer on Copyright § 10.15[A][2] .......... 21

4 Nimmer on Copyright § 14.04[B][1][b] .......... 24

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the Copyright Act, 17 U.S.C. § 501. On May 14, 2026, the district court granted Delta's motion to dismiss, dismissed CA, Inc.'s Complaint with prejudice, and directed the Clerk to terminate the action. That order disposed of all claims as to all parties and is a final, appealable decision.

CA timely filed its notice of appeal on June 11, 2026, within thirty days of entry of the judgment. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Does a licensee that runs copyrighted software on more devices than its license authorizes exceed the scope of the license and thereby infringe the copyright owner's exclusive right of reproduction under the Copyright Act?

2. Does a license provision capping the number of copies of copyrighted software the licensee may make constitute a condition of the license where the agreement uses language that Georgia courts hold creates such a condition?

3. Was dismissal on the pleadings proper when the district court construed contract language it suggested was ambiguous against the plaintiff and non-moving party at the pleading stage?

4. Was dismissal with prejudice proper where the dismissal rested on construction of ambiguous language, the district court did not find further amendment to be futile, and the plaintiff had no meaningful opportunity to seek leave to amend before entry of final judgment?

## INTRODUCTION

This case is about whether the Copyright Act provides a remedy to the owner of copyrighted software whose licensee uses the software on thousands of devices beyond the license's limit, without the owner's consent and without paying for that excess use. Appellant CA, Inc. ("CA") licenses DX NetOps, its proprietary network-monitoring software, on a per-device basis. Appellee Delta Air Lines, Inc. ("Delta") paid CA for licenses to run DX NetOps on a maximum of 33,288 devices. Delta ran the software on as many as 48,097 devices. Delta never asked CA for more licenses to cover the additional 14,809 devices and never paid for that excess use.

The district court held that the Copyright Act has nothing to say about this unauthorized use of copyrighted software. The district court reasoned that CA could not assert a copyright-infringement claim unless Delta's unauthorized use violated a condition of the license, rather than a covenant. Because the license agreements at issue state the device limit in a column headed "Authorized Use Limitation" rather than prefacing it with words like "on condition that," the district court invoked a state-law presumption disfavoring conditions, labeled the authorized-use limit a

covenant, and held that CA's only recourse is a contract claim. On that view, a licensee that reproduces software on thousands of devices beyond the limit in its license ends up owing precisely what it would have owed had it bought the licenses in the first place. In other words, infringing an owner's copyright is merely a purchase option, exercisable after the fact and on the licensee's own timetable.

That result rests on a threshold error. Before a court can ask whether a license term is a condition or a covenant, it must ask what the license granted. This license granted the right to use DX NetOps on a stated number of devices. That number was not a promise about how Delta would behave with respect to the software it had licensed; it was the measure of what Delta licensed in the first place. Reproduction beyond that limit is reproduction CA never authorized—which is to say, infringement. The district court's conclusion otherwise requires reversal.

The district court's covenant-versus-condition framework fares no better on its own terms. The parties' Master License Agreement ("MLA") licenses DX NetOps only "subject to the terms and conditions" of that agreement, bars Delta from reproducing the software without CA's prior written consent, and lets CA terminate upon breach of any term in the

parties' agreements. The specific order forms under which Delta licensed DX NetOps go further still: they suspend all of Delta's use rights until it pays the amounts set out in a payment schedule. Those payment amounts are based on the number of devices licensed. The district court read that provision to mean that Delta's license was conditioned on timely payment. Delta never paid for a license to cover the excess devices. By the district court's own construction, Delta held no license to use DX NetOps on those devices. The court nonetheless entered judgment in Delta's favor, dismissing CA's Complaint with prejudice and declining to consider CA's request for leave to amend.

The consequences of the rule applied by the district court reach well past this case. Enterprise software is often licensed in metered quantities—devices, servers, instances—and that meter is how the parties price the license. If a numerical limit protects the copyright owner only when a license agreement contains certain magic words, the licensing model of an entire industry turns on a drafting formality unrelated to the harm. Licensees will have every incentive to reproduce copyrighted software as much as they want, secure in the knowledge that they need only pay contract damages for their excess use. That outcome

cannot be squared with the Copyright Act. Congress gave copyright owners remedies meant to deter such conduct, not to ratify it. The judgment should be reversed.

## STATEMENT OF THE CASE

### I. The License Framework and the Authorized Use Limitation

CA creates and licenses enterprise software. Doc. 1 (Compl.) ¶¶ 14, 17. Among its products is DX NetOps, network-operations software for which CA is the registered copyright owner. *Id.* ¶¶ 23, 40. CA licensed DX NetOps to Delta under a 1989 Master License Agreement ("MLA"), which grants Delta a nonexclusive license to use the "Licensed Program" described in CA-accepted "Order Forms." Doc. 33 (Order on Motion to Dismiss) at 2; Doc. 14-2 (Master License Agreement).

The scope of what Delta could use was fixed by device counts in each Order Form. Delta licensed DX NetOps from CA in 2023 and 2024 under two Order Forms. The 2023 and 2024 Order Forms each sets out, in a column titled "Authorized Use Limitation," the precise number of devices on which Delta could use and reproduce DX NetOps: 9,431 devices:

| Offering Name | Offering Code | License Type | Authorized Use Limitation | Start Date | End Date |
|---|---|---|---|---|---|
| DX Infrastructure Management | DXIMGR990 | Subscription | 4,478 Devices | Jan 01, 2023 | Dec 31, 2023 |
| DX NetOps | DXNOP2990 | Subscription | 9,431 Devices | Jan 01, 2023 | Dec 31, 2023 |

Doc. 33 at 10 n.5; Doc. 14-3 (2023 Order Form) at 3; Doc. 14-4 (2024 Order Form) at 3. In addition to the Order Forms executed with CA, Delta licensed 23,857 devices through Kyndryl, CA's partner. Doc. 33 at 3. In total, Delta was allowed to use and reproduce DX NetOps on 33,288 devices. *Id.*

The MLA conditions the grant of licenses on both its terms and the terms of the Order Forms, including most notably the device limitations. It provides that, "[w]hen CA accepts an Order Form," Delta "will have, *subject to the terms and conditions of this Agreement*, a nontransferable and nonexclusive license to use" the Licensed Program "*described in the Order Form(s)* referencing this Agreement." Doc. 14-2 at 2 (emphasis added). The MLA likewise "authorizes" Delta to use the "Licensed Programs[] covered by Order Form(s) accepted by CA." *Id.* It further provides that, "[e]xcept for archive purposes," Delta "will not make or permit others to make copies of or reproduce *any part of the Licensed Program* in any form without the prior written consent of CA," and that operating the Licensed Program other than with the Designated CPU(s) is "subject to obtaining CA's consent." *Id.* (emphasis added). Under the heading "Breach and Termination," the MLA provides that if Delta

"breaches any term of this Agreement or any Order Form," CA "shall have the right to terminate this Agreement immediately." *Id.* at 3.

Each Order Form incorporates the MLA and adds terms of its own. The Order Forms recite that they are "governed by the terms and *conditions* of this Order and the [MLA]." Doc. 33 at 10–11; Doc. 14-4 at 1. They provide that the license to use DX NetOps is "subject to the [MLA] and this Order," and that "[a]ll capitalized terms not defined in this Order shall have the meanings ascribed to them in the [MLA]." Doc. 14-3 at 3–4; *see also* Doc. 33 at 11. Finally, the Order Forms provide that Delta's "[f]ailure to timely remit payment of all amounts set forth in the Payment Schedule shall[,] after written notice by CA and a reasonable opportunity to remit such payment by [Delta], to the maximum extent permitted by applicable law, relieve CA of any and all support obligations hereunder and all Customer subscription use rights shall be suspended until payment is tendered." Doc. 14-3 at 3; Doc. 33 at 12.

## II. Delta's Overuse and the Notice of Infringement

In 2024, CA obtained data showing that Delta was running DX NetOps on as many as 48,097 devices—14,809 more than Delta's authorized limit. Doc. 1 ¶¶ 33, 35; Doc. 33 at 3. The 14,809-device overage

is approximately 44% more than Delta's authorized maximum. On August 20, 2024, CA notified Delta that its use beyond the Authorized Use Limitations constituted copyright infringement and a material breach of the parties' agreements. Doc. 1 ¶ 37. Delta responded by suing CA in Georgia state court; CA counterclaimed for breach and filed this separate action for copyright infringement. Doc. 33 at 3–4.

### III. Proceedings Below

CA's Complaint pleaded a single count of copyright infringement under Section 501 of the Copyright Act, alleging that Delta's use of DX NetOps on 14,809 unlicensed devices violated CA's exclusive right of reproduction under Section 106(1). Doc. 1 ¶¶ 39–47. Delta moved to dismiss. Doc. 14.

Without oral argument, the district court granted the motion and dismissed CA's Complaint with prejudice. *Id.* at 13. Applying Georgia contract law, the court held that the "Authorized Use Limitation" is not a condition but a covenant. *Id.* at 11–13. The court relied principally on *Fantastic Fakes, Inc. v. Pickwick International, Inc.*, 661 F.2d 479 (5th Cir. Unit B Nov. 1981), and *Yellowpages Photos, Inc. v. YP, LLC*, 418 F. Supp. 3d 1030 (M.D. Fla. 2019), *aff'd*, 856 F. App'x 846 (11th Cir. 2021).

The court concluded that, because the limitation was a covenant, "CA's allegations of Delta's breach of the authorized use limitation for the DX NetOps software fail to support its copyright infringement claim." Doc. 33 at 13. The court declined to consider CA's request for leave to amend. *Id.* at 13–14 n.8. This appeal followed.

## STANDARD OF REVIEW

This Court reviews the grant of a Rule 12(b)(6) motion to dismiss *de novo*, accepting the complaint's well-pleaded allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). The interpretation of an unambiguous contract is a question of law also reviewed *de novo*; whether a contract term is ambiguous is also a legal question. *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1039 (11th Cir. 2018).

## SUMMARY OF THE ARGUMENT

CA licensed its DX NetOps software to Delta for use on a fixed number of devices. Delta exceeded that limit by more than 40%, deploying the software on as many as 14,809 devices beyond what the

agreements permitted. The district court dismissed CA's copyright claim on the pleadings without first determining the scope of Delta's license. Instead, the district court asked only whether the Authorized Use Limitation was phrased as a condition or a covenant, concluded the limitation was a covenant by invoking a state-law presumption disfavoring conditions, and held that CA's sole remedy lies in contract. Doc. 33 at 11–13. Each step of that analysis was error, and the judgment should be reversed for the following reasons.

1. The district court applied the wrong legal test. A license shields a licensee only if the use falls within the license's scope. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Applying this rule to a license agreement containing a numerical limit on reproduction is an issue of first impression for this Court. The Court should adopt a straightforward rule: a limit on the number of copies a licensee may make measures what was licensed, so reproducing software beyond that limit is infringement whether or not the limit is couched expressly in conditional terms. Such a rule accords with decisions reached by courts across the country confronting similar situations. For instance, the Ninth Circuit applied this rule to a hypothetical license that granted the

licensee "the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 940 (9th Cir. 2010). Making a hundred copies of the book exceeds the scope of the license, which gives rise to an infringement claim. *Id.* Reading the last ten pages of the book gives rise only to a breach-of-contract claim because that collateral promise does not implicate any of the exclusive rights protected by the Copyright Act. *Id.* Courts elsewhere have applied that distinction to numerical caps without parsing the words surrounding them. *See, e.g.*, *Pac. Stock, Inc. v. Pearson Educ., Inc.*, 927 F. Supp. 2d 991, 998 (D. Haw. 2013); *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 128–30 (S.D.N.Y. 2019). Because the Authorized Use Limitation fixed the scope of Delta's license at 33,288 devices, Delta's use of DX NetOps beyond that numerical limit constitutes infringement without regard to whether the Authorized Use Limitation is a covenant or a condition under state law.

2. The Authorized Use Limitation is a condition (not a covenant) even under the state-law framework the district court applied. Georgia law requires no magic words; it asks whether the agreements, read as a

whole, condition the grant. *Pargar, LLC v. CP Summit Retail, LLC*, 730 S.E.2d 136, 140 n.1 (Ga. Ct. App. 2012); *Munford, Inc. v. Citizens & S. Nat'l Bank*, 258 S.E.2d 766, 767 (Ga. Ct. App. 1979). Delta's agreements do so repeatedly, and in terms Georgia law treats as words of defeasance. The MLA grants the license "subject to the terms and conditions of this Agreement," which includes the Authorized Use Limitation. The Georgia Supreme Court has treated such language as creating a condition. *See Blue Ridge Apartment Co. v. Telfair Stockton & Co.*, 54 S.E.2d 608, 613 (Ga. 1949). The MLA also withholds any authority to reproduce the program "without the prior written consent of CA"; and it entitles CA to "terminate this Agreement immediately" if Delta "breaches any term of this Agreement or any Order Form." Doc. 14-2 at 2–3. In addition, the Order Forms suspend "all" of Delta's "subscription use rights . . . until payment is tendered." Doc. 14-3 at 3. Georgia's whole-contract canon reinforces that conditional reading: courts apply O.C.G.A. § 13-2-2(4) to construe genuinely ambiguous language as creating a condition where any other reading would leave a provision without effect. *Emanuel Tractor Sales, Inc. v. Dep't of Transp.*, 571 S.E.2d 150, 155–56 (Ga. Ct. App. 2002); *Sheridan v. Crown Cap. Corp.*, 554 S.E.2d 296, 299, 300–01

(Ga. Ct. App. 2001). The presumption disfavoring conditions is therefore inapposite: it governs only instruments containing "no express words of defeasance, forfeiture or reversion," and these agreements are replete with them. *Allen v. Sea Gardens Seafood, Inc.*, 723 S.E.2d 669, 671 (Ga. 2012); *Munford*, 258 S.E.2d at 767. In all events, using a state-law presumption to render an express numerical limit unenforceable in copyright would disserve federal policy, under which a license is assumed to prohibit any use it does not authorize. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989).

The agreements' payment provision also supplies a second and independent basis for reversal because the district court itself construed it as conditional. The court held that the provision "conditions Delta's license to the software on its timely payment for that license." Doc. 33 at 12. That construction cannot be cabined to payment alone. The table directly above the Payment Schedule describes the quantities of the licensed CA offerings the payment will buy, so a condition on payment is necessarily a condition on device count. The district court could not hold the one conditional and the other not. Delta never paid for the 14,809 excess devices, so it held no use right covering them. Use that no license

right covers is infringement. *Fantastic Fakes*, 661 F.2d at 483; *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753–54 (11th Cir. 1997). Enforcing the limitation as a condition works no forfeiture, moreover, because Delta never acquired any right in the unpaid-for devices that a condition could take away. *See Dillard v. Manhattan Life Ins. Co.*, 44 Ga. 119, 123 (1871).

3. Dismissal on the pleadings was independently erroneous. The district court never held the operative language unambiguous. It found that the language in the parties' agreements providing that Delta's software use is "governed by the terms and *conditions*" and "subject to the terms and *conditions*" of the Order Forms and the MLA "simply acknowledges that there *are* terms and conditions, not that the Authorized Use Limitation is one or the other." Doc. 33 at 12 (quoting Doc. 24 at 8). The district court then applied Georgia's presumption disfavoring conditions to break the tie. Doc. 33 at 11–12. Language a court itself cannot place in either category is language susceptible of more than one reasonable reading, making dismissal under Rule 12(b)(6) erroneous. *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237, 1242 (11th Cir. 2019). A presumption cannot supply what the canons of construction did not, and the anti-forfeiture rationale that gives this

particular presumption force is absent where, as here, no forfeiture is in prospect. *See Fulton Cnty. v. Collum Props., Inc.*, 388 S.E.2d 916, 918 (Ga. Ct. App. 1989). CA's construction is at a minimum reasonable, and a reasonable construction cannot be rejected against the pleader before any record exists. *BioHealth Med. Lab'y, Inc. v. Cigna Health & Life Ins. Co.*, 706 F. App'x 521, 524 (11th Cir. 2017).

4. If this Court identifies a deficiency in CA's allegations that precludes outright reversal, the dismissal with prejudice should be vacated. CA's first and only pleading was dismissed with prejudice on a construction of contract language the district court indicated was ambiguous and reached without the benefit of discovery. Judgment was entered the same day, and the district court declined to consider CA's request for leave to amend without finding that amendment would be futile. Doc. 33 at 13 & n.8. CA should be permitted to seek leave to amend on remand.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. The District Court Applied the Wrong Legal Test: Use That Exceeds a License's Numerical Limitation Is Infringement Without Regard to Condition or Covenant Language

To state a claim for direct infringement, a copyright owner must allege ownership of the work and violation of at least one exclusive right under the Copyright Act. *See* 17 U.S.C. § 501(a). One such right enshrined in the Copyright Act is the "right[] to . . . reproduce the copyrighted work." *Id.* § 106(1). CA alleged both elements by asserting that Delta ran and thereby reproduced DX NetOps, CA's copyrighted software, on at least 14,809 devices more than was authorized under the Order Forms. *E.g.*, Doc. 1 ¶ 2. The district court dismissed CA's Complaint after concluding that the Authorized Use Limitation was a covenant rather than a condition and holding that CA's sole remedy was for breach of contract. Doc. 33 at 11–13. This was error.

Although the existence of a license is generally a defense to a copyright infringement claim, a license will not shield a licensee from liability for copyright infringement if the licensee's use "exceeded the scope of th[e] license." *Latimer*, 601 F.3d at 1235, 1237 (reversing summary judgment for the licensee where the record permitted a finding

that the licensee's use exceeded limits the licensor had conveyed); *MCA Television Ltd. v. Public Int. Corp.*, 171 F.3d 1265, 1275 (11th Cir. 1999) ("[C]opyright protections remain in the background to ensure that licensees do not use materials in ways that exceed the scope of their licenses.").[1]

This Court has not yet had occasion to apply that rule to a licensee that exceeds a numerical limitation imposed by the license agreement. Nor has any court in this circuit previously applied the covenant-versus-condition analysis in the context of numerical limitations on reproduction—for good reason. A licensee that exceeds a license's numerical limit on copies infringes the copyright, because that limit defines the scope of the license. Courts confronting such circumstances need not search the language of the governing agreements for conditional language, because the type of limit—a limit on the number of copies—unambiguously defines the scope of the license's protection. This is fundamentally different from a licensee violating terms regarding the

[1] *See also, e.g.*, *S.O.S., Inc.*, 886 F.2d at 1087 ("A licensee infringes the owner's copyright if its use exceeds the scope of its license."); *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003) ("[T]he licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license." (citation omitted)).

way a license can be used, where a court must read the language of the governing agreements to determine whether the parties intended to condition the license grant on compliance with those terms.

The Ninth Circuit drew this distinction in *MDY Industries, LLC*, 629 F.3d at 940. There, the court described a hypothetical "license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages." *Id.* at 940 (quoting *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005)). A licensee who violated a collateral promise by reading the last ten pages would be subject only to a cause of action for breach of contract, "because reading a book does not violate any right protected by copyright law." *Id.* "A licensee who made a hundred copies of the book," however, "would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license." *Id.*

District courts in other circuits rely on this distinction to hold that use in excess of a license's numerical limit exceeds the scope of the license and infringes the owner's copyright, without requiring an analysis of the

specific language in the license agreement surrounding the numerical limit. For example, in *Pacific Stock, Inc. v. Pearson Education, Inc.*, the plaintiff alleged that the defendant used its copyrighted images in more than the 40,000 textbooks allowed by the parties' agreements. 927 F. Supp. 2d at 998. The court rejected the defendant's contention that "use exceeding the limit of a license is a contractual issue." *Id.* It did so without analyzing the contractual language surrounding the limit: "The limits in the license define the scope of the license; they are not simply covenants enforceable only through a breach of contract action." *Id.* A court in the Southern District of New York, relying on "the weight of Second Circuit authority," reached the same conclusion regarding a defendant's printing of more copies of a copyrighted photograph than permitted under its license in *Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*, 399 F. Supp. 3d at 128–30. "This type of claim"—use in excess of a numerical limit—"does not require the court to consider whether a particular contract term was a condition or a covenant." *Id.*[2]

---

[2] *See also, e.g.*, *Actian Corp. v. AutoClerk, Inc.*, 2026 WL 974507, at *6 (N.D. Cal. Apr. 10, 2026) (concluding that the defendants' "alleged practice of mass copying and redistributing the licensed software goes beyond the scope of the License Agreements" without considering the language of the limitations); *Fairview Health Servs. v. Quest Software,*

In other words, the covenant-versus-condition inquiry seeks to separate terms that define the limits of what was licensed from terms that govern how a licensee behaves with what it licensed. *See* 3 Nimmer § 10.15[A][2] (synthesizing the caselaw as, "[m]ore generally, when a license is limited in scope, exploitation of the copyrighted work outside of the specified limits constitutes infringement"). A limit on the number of authorized copies is a paradigmatic example of a term defining the scope of the license, whether or not it is couched in conditional language.

This Court should apply that rule here. The Order Forms include an Authorized Use Limitation that defines the scope of the DX NetOps license as limited to 33,288 devices. Delta's use of the software on an additional 14,809 devices exceeded the scope of the license. There is no

---

*Inc.*, 2021 WL 679260, at *7 (D. Minn. Feb. 22, 2021) (holding that, because the agreement at issue "granted [the defendant] a license only to 'the quantities of each item of [s]oftware identified in the applicable [o]rder,'" the plaintiff had "plausibly alleged that by exceeding the numerical limitation" the defendant had "exceeded the scope of its license"); *Brittney Gobble Photography LLC v. Wenn Ltd.*, 2017 WL 10188859, at *9 (E.D. Tenn. Sept. 5, 2017) (denying motion to dismiss copyright claim, relying on "the plethora of authority stating that where a license is limited in scope, and a licensee goes beyond that scope, a condition to the license has been violated and the copyright owner may bring an infringement claim" (citing 3 Nimmer § 10.14[A][2])).

need to analyze the surrounding language to determine whether the Authorized Use Limitation is a condition or covenant.

Indeed, district courts within this circuit have already applied that rule in analogous circumstances. For example, in *CBS, Inc. v. PrimeTime 24 Joint Venture*, the court held that the defendant infringed the plaintiff's copyrights by broadcasting copyrighted programming outside the permitted audience under the governing license. 76 F. Supp. 2d 1333, 1337 (S.D. Fla. 1998). In *CMAX/Cleveland, Inc. v. UCR, Inc.*, the court concluded that the defendant licensee infringed the owner's copyright when it disclosed and transferred a copy of the licensed program beyond what the license permitted. 804 F. Supp. 337, 356–57 (M.D. Ga. 1992). And in *Michael Grecco Productions, Inc. v. RGB Ventures, LLC*, the court held that the defendant "impermissibly exceeded the scope of its license by distributing [the plaintiff's] copyrighted images" in a manner not authorized by the governing agreement. 2017 WL 4077045, at *6 (M.D. Fla. Sept. 14, 2017). In each case, the court concluded that use of the copyrighted material exceeded the scope of the license without investigating the language of the limitation to determine whether it was a condition or covenant.

Here, the district court did the opposite. It dismissed CA's Complaint after concluding that the Authorized Use Limitation was a covenant rather than a condition, without first determining what Delta's license agreements granted. Doc. 33 at 11–13. The district court relied on two cases—*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.* and *Yellowpages Photos, Inc. v. YP, LLC*—to conclude that a court must always interpret the language of the limitation to determine whether the conduct in question violates a covenant or condition of the license. Doc. 33 at 7–9, 11–13.

Both cases are inapt because neither involved allegations that the defendant's use beyond a numerical limit exceeded the scope of the license. In *Fantastic Fakes*, the plaintiff alleged that the defendant failed to fulfill its promise to "place the notice of [the plaintiff's] copyright" on each recording—a tangential promise regarding *how* the licensee was permitted to use the license that did not define the scope of the license. 661 F.2d at 483. In *Yellowpages*, the plaintiff argued only that the defendant had "lost its right to use [the plaintiff's] images" when it allowed "outsourcers" to use the licensed images, a violation of a contract term that permitted only the defendant's "employees" to use the license.

418 F. Supp. 3d at 1043; *see also Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 857–58 (11th Cir. 2021) ("YPPI argues that Yellow Pages lost its right to use YPPI's images by allowing outsourcers to use images in violation of the Berry License."). In those contexts, the courts analyzed the character of the limitation to determine whether the parties intended the violation of that limitation to terminate the agreement. Neither, however, addressed the type of infringement at issue here: the use of copyrighted software exceeding a numerical limit that explicitly defines the scope of the license.

The practical consequences of the rule applied by the district court are perverse: it incentivizes licensees to reproduce copyrighted software beyond what their licenses permit. A licensee who knows its exposure is capped at contract damages, even if it is caught reproducing the software beyond the scope of the license, has every incentive to deploy copyrighted software far beyond what it purchased, with no need to negotiate with or receive permission from the copyright owner. This contravenes Congress's intention in legislating additional remedies—including disgorgement, enhanced damages, and injunctive relief—to discourage the infringement of intellectual property. *See, e.g.*, *Taylor v. Meirick*, 712

F.2d 1112, 1120 (7th Cir. 1983) ("By preventing infringers from obtaining any net profit[, the Copyright Act] makes any would-be infringer negotiate directly with the owner of a copyright that he wants to use . . . ."); *see also F.W. Woolworth Co. v. Contemp. Arts, Inc.*, 344 U.S. 228, 233 (1952) ("The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct."); 4 Nimmer § 14.04[B][1][b] (noting that since 1976, Congress has repeatedly increased the statutory damages range to account for both inflation and deterrence).

Those consequences are not hypothetical for enterprise software like DX NetOps, which is licensed by metered quantity, such as the Authorized Use Limitation in Delta's agreements. If a numerical limit on usage does not define the scope of a license, then the standard licensing model for an entire industry is dependent on a formality bearing no relationship to the harm. A licensee whose agreement lacks the magic words could then convert the license into whatever quantity it wished, leaving the copyright owner with nothing but a contract claim. That is not, and should not be, the law in this Circuit. The district court's judgment should be reversed for this reason alone.

## II. Even Under the Condition or Covenant Framework, the Authorized Use Limitation in Delta's Agreements Is a Condition

Even if the district court needed to analyze the language of the parties' agreements to determine whether the Authorized Use Limitation was a covenant or a condition, it erred in concluding that the limitation was a covenant because the parties' agreements use language that Georgia courts have held creates conditions.

### A. The MLA and Order Forms condition the license on the numerical limitation.

A condition can be a condition precedent or a condition subsequent. O.C.G.A. § 13-3-4. Under Georgia law, "[n]o precise technical words are required to create a condition subsequent." *Munford*, 258 S.E.2d at 767. Where "the plain words of the [contract] declare that a breach of the conditions shall authorize the [licensor] to terminate the [license]," the term at issue is construed as a condition subsequent. *Id.* Conditions precedent "are created by language *such as* 'on condition that,' 'if,' and 'provided,'" *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1131 (11th Cir. 2014) (emphasis added) (quoting *Massih v. Jim Moran & Assocs., Inc.*, 542 F. Supp. 2d 1324, 1330 (M.D. Ga. 2008)), as well as "subject to," *Blue Ridge Apartment Co.*, 54 S.E.2d at 613. Whether the

parties intended to condition a grant on compliance with a term depends not on "specific technical terms," but on the agreements "read as a whole." *Pargar*, 730 S.E.2d at 140 n.1 (finding a condition even though the document "did not expressly use words such as 'on condition that,' 'if,' or 'provided that'" because Georgia law "does not require specific technical terms"). "Though conditions . . . are not favored in the construction of contracts, where the language of the contract clearly creates such a condition, that condition must be enforced." *Allen*, 723 S.E.2d at 671.

Here, the parties' agreements are replete with language reflecting that reproducing CA's software beyond the "Authorized Use Limitation" violates a condition of the license. Start with the term itself. The term's three words are each words of scope, not covenant. "Authorized" describes a status the licensor confers, not conduct the licensee undertakes. To say that use of DX NetOps is "authorized" on a specified number of devices is to say that use on devices beyond that number is unauthorized, and that distinction is the one on which infringement turns. Where a licensee's use falls outside what the license permits, its acts are "without the authority of the copyright owner" and render it "liable for copyright infringement." *Fantastic Fakes*, 661 F.2d at 483. "Use" is the licensed act. The MLA

grants Delta a "license to use the Licensed Program(s)[] covered by Order Form(s) accepted by CA," under the heading "USE OF LICENSED PROGRAM," so "Authorized Use" is coextensive with the grant itself. Doc. 14-2 at 2. The term does not name something Delta agreed to do alongside its license; it names the license. And "Limitation" is by definition a boundary. It marks the outer edge of a thing; it does not promise performance. Read together, the three words fix the outer boundary of the use that is permitted, which is the definition of a scope limitation, and Georgia law does not require the parties to have added "on condition that" to make it one. *Munford*, 258 S.E.2d at 767; *Pargar*, 730 S.E.2d at 140 n.1.

The Authorized Use Limitation's place in the Order Forms confirms this reading. "Authorized Use Limitation" is a column heading in the Order Forms' table of what CA licensed, appearing alongside "Offering Name," "Offering Code," "License Type," "Start Date," and "End Date." Doc. 14-3 at 3; Doc. 14-4 at 3. Every entry in that row states an attribute of the license granted—which product, which code, which type, for how long. Not one of them is a covenant. No one would say that a licensee that kept running DX NetOps for three years past the "End Date" had merely

breached a promise; its use would be unlicensed and infringing. The Authorized Use Limitation sits in the same table and performs the same function, bounding the grant by quantity rather than by time.

The MLA, which the Order Forms incorporate, granted Delta a license "*subject to* the terms and conditions of this Agreement," including the Authorized Use Limitation. Doc. 14-2 at 2 (emphasis added). The Order Forms, in turn, provided that the license to use DX NetOps was "subject to the CA Agreement [*i.e.*, the MLA] and this Order." Doc. 14-3 at 4. The MLA and Order Forms also supply the operative words of defeasance. First, the MLA provided that, "[e]xcept for archive purposes," Delta "will not make or permit others to make copies of or reproduce any part of the Licensed Program in any form *without the prior written consent of CA*." Doc. 14-2 at 2 (emphasis added). Authority to reproduce is thus withheld unless and until CA grants it; the clause does not promise a remedy in damages for reproduction CA never approved. Second, the Order Forms suspend Delta's use rights entirely if it fails to pay. Doc. 14-3 at 3; Doc. 14-4 at 4. Each provision states not what Delta promised to do but what Delta may not do absent a triggering event—a hallmark of a condition rather than a covenant. The MLA's separate right

to "terminate this Agreement immediately" if Delta "breaches any term of this Agreement or any Order Form" corroborates that the parties treated compliance with the Order Forms' terms as bearing on the continued existence of the license. Doc. 14-2 at 3.[3]

The district court acknowledged that the payment provision "conditions Delta's license to the software on its timely payment for that license." Doc. 33 at 12 & n.7. In other words, no payment, no license. As discussed below, the district court invoked the payment provision as a contrast to the Authorized Use Limitation. Because the Order Forms condition use rights on payment in express terms, the court reasoned, their silence on the Authorized Use Limitation showed that the parties

[3] Delta suggested below that the Authorized Use Limitation caps only the number of devices monitored rather than copies made, and that CA pleaded only over-use and not unauthorized reproduction. That cannot be squared with Delta's acknowledgment that it "use[d] copies of the DX NetOps software to monitor its network," or with the MLA's prohibition on making copies without CA's prior written consent. Doc. 14 (Motion to Dismiss) at 15; Doc. 14-2 at 2. At any rate, a copyright plaintiff need not plead talismanic words such as "copying"; allegations of wrongful use of software beyond the scope of the license suffice. *See GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299 (M.D. Fla. 2015); *Audio Sys. of Fla., Inc. v. Simplexgrinnell LP*, 2003 WL 22830002, at *4 n.3 (M.D. Fla. July 14, 2003). "The specific technological mechanism by which [the infringing reproduction] is accomplished may be explored during discovery." *Live Face on Web, LLC v. Emerson Cleaners, Inc.*, 66 F. Supp. 3d 551, 555 (D.N.J. 2014).

did not intend to condition the license on the device count. Doc. 33 at 12. But the contrast collapses, because payment and device count are not two subjects. They are one: the scheduled amounts are the price of the quantities the Order Forms license, so a condition on payment is necessarily a condition on quantity. *See infra* Part II.B.

Even if each of these terms individually were not sufficient to render the device limitation a condition, the confluence of them all together, "when read as a whole," establishes that the license grant was conditioned on staying within the numerical limits. Georgia's whole-contract canon compels that reading rather than forbidding it. O.C.G.A. § 13-2-2(4). That statute directs a court to look to the whole contract in construing any part, and Georgia courts accordingly hold that a contract "must be construed as a whole rather than in separate and distinct parts, giving effect to all terms." *Emanuel Tractor Sales*, 571 S.E.2d at 155.

The court in *Emanuel Tractor Sales* applied that canon to resolve a facial ambiguity in favor of a condition, not against one. Confronted with two lease sentences that appeared to negate one another, the court construed one sentence as a self-executing condition rather than reading it out of the agreement. *See id.* at 155–56. It did so while reiterating that

"[n]o precise technical words are required to create a condition subsequent." *Id.* at 154 (citation omitted).

*Sheridan v. Crown Capital Corp.* is to the same effect. Applying the rule that a contract be construed to "give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect," the court held that the agreement before it "clearly provided for a condition subsequent for the termination of the contract." 554 S.E.2d at 299, 300–301 (citation omitted).

The whole-contract canon therefore cuts in CA's favor. Reading the Authorized Use Limitation as a bare promise would leave the MLA's prior-written-consent clause and the Order Forms' payment-suspension provision with no work to do as to the very quantity those provisions price and police. Any usage beyond those limits was outside the scope of the license.

*Sohm v. Scholastic Inc.* is also instructive—and it is the case the district court invoked to distinguish this one. Doc. 33 at 9–10. In *Sohm*, a photographer licensed images to a publisher through a master agreement and a series of invoices. 959 F.3d 39, 42, 46–47 (2d Cir. 2020),

*abrogated on other grounds by Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366 (2024). The publisher printed more copies than the licenses allowed. *Id.* at 42. The district court held that the print-run limitations were covenants, so that the photographer's claims sounded only in contract, and granted summary judgment to the publisher. *Id.* at 44–45. The Second Circuit reversed, holding that the print-run limitation was "a restriction upon which the license [wa]s conditioned," and that the photographer had properly pleaded copyright infringement. *Id.* at 47. The Second Circuit reached that result notwithstanding a presumption against conditions materially identical to the one the district court applied below. *Id.* at 46. The presumption did not carry the day because "specific, talismanic words are not required," and "linguistic conventions of condition—such as . . . 'subject to'—can 'make plain' a condition precedent." *Id.* (citation omitted and cleaned up).

The language the Second Circuit found sufficient in *Sohm* is not materially more express than the language here. The license at issue in *Sohm* was "conditioned upon" the licensee "meeting all conditions and restrictions imposed by" the licensor. *Id.* at 46. That clause did not identify which "conditions and restrictions" were in view, *see id.*, which

is precisely the kind of open-ended cross-reference the district court dismissed here as language that "simply acknowledges that there are terms and conditions." Doc. 33 at 12. What gave content to the provision at issue in *Sohm* was the transactional document: reproduction was limited to "the use, medium, time period, *print run*, placement, size of image, territory, and any other restrictions *indicated in the invoice*," and "[t]he invoices, in turn, specified the *quantity* . . . licensed." *Sohm*, 959 F.3d at 46 (emphasis added). The Second Circuit did not treat the general clause and the quantity as separate provisions, one conditional and one not. It read them together and held the resulting limitation a condition. *Id.* at 47.

That is this case. The MLA only grants a license to use the software "described in the Order Form(s)," "subject to the terms and conditions of this Agreement." Doc. 14-2 at 2. The tables in the Order Forms, in turn, describe exactly what is being licensed: DX NetOps on a specified number of devices under the heading "Authorized Use Limitation." Doc. 14-3 at 3; Doc. 14-4 at 3. And the Order Forms condition "all" of Delta's use rights on payment for the licensed quantities and any additional reproduction on prior consent. Doc. 14-3 at 3; Doc. 14-4 at 4. A master agreement

granting rights subject to its terms, a transactional document limiting and quantifying the grant, and a payment condition measured by that quantity—the same three elements, in the same relation, that made the print-run limitation conditional in *Sohm*.

The district court distinguished *Sohm* on the ground that the license there was "replete with the conditional language of conditions precedent." Doc. 33 at 10 (quoting 959 F.3d at 47). But that characterization described a license whose express conditional clause was similar to the one in the MLA, and whose operative limits—including the print run—appeared as quantities in an invoice.

Despite the similarities between the numerical limit in *Sohm* and the Unauthorized Use Limitation in this case, the district court instead found this case governed by *Yellowpages*. Doc. 33 at 9–10. That case is factually inapposite. The restriction there governed *who* could act on the license images—whether "outsourcers" beyond the licensee's "employees" could create modified images—not how many copies existed. 418 F. Supp. 3d at 1043–44. No numerical limit on reproduction was at issue; the court applied Ohio law; and it was a district court decision, affirmed without published opinion. *See id.* A cap on authorized personnel restricts the

manner of a licensee's performance. A cap on the number of devices on which software may be reproduced measures the reproduction right itself. *See* 17 U.S.C. § 106(1).

The district court erred in concluding that the Authorized Use Limitation was not a condition. The court's analysis began and ended with a single column of the Order Forms. The court observed in error and without analysis that the label "Authorized Use Limitation" was not "facially conditional," and that the phrases "governed by" and "subject to" "simply acknowledge[] that there are terms and conditions, not that the Authorized Use Limitation is one or the other." Doc. 33 at 11–13 (emphasis omitted). From that, the court concluded that the numerical limitation on reproduction of DX NetOps was not a condition.

But Georgia law does not permit a court to confine its analysis to a search for precise magic words. Conditions are created through any "explicit statements that certain events are to be construed as conditions," *Bates*, 768 F.3d at 1131 (citation omitted), and can be gleaned from the agreement read as a whole, *Pargar, LLC*, 730 S.E.2d at 140 n.1; *see also Blue Ridge Apartment Co.*, 54 S.E.2d at 612–13 ("The words, 'subject, however, to,' created a condition precedent."); *Bates*, 768

F.3d at 1132 (holding that a deed that "d[id] not authorize acceleration or foreclosure if not permitted by regulations of the [s]ecretary" "clearly makes compliance with HUD regulations a condition precedent"); *Sasser & Co. v. Griffin*, 210 S.E.2d 34, 39 (Ga. Ct. App. 1974) (holding the use of the word "only" in a subcontract was enough to create a condition precedent to the prime contractor's duty to pay where the subcontract provided that "payments will be made from money received from the owner *only*" (emphasis added)). Read as a whole, the agreements conditioned Delta's authority to reproduce DX NetOps on CA's prior written consent, confined that authority to the devices (or number of devices) the Order Forms identified, and expanded it only by express permission.

The presumption against conditions on which the district court relied does not rescue its conclusion. Georgia construes doubtful language as a covenant only where an instrument contains "no express words of defeasance, forfeiture or reversion." *Munford*, 258 S.E.2d at 767. But as in *Munford*, "[t]his is not [such] a case." *Id.* As explained above, the MLA supplies precisely such words: the MLA withholds authority to reproduce the Licensed Program absent "the prior written consent of CA,"

and the Order Forms provide that "all" of Delta's "subscription use rights" are "suspended until payment is tendered." Doc. 14-2 at 2; Doc. 14-3 at 3. The MLA also entitles CA to terminate the license immediately if Delta "breaches any term of this Agreement or any Order Form." Doc. 14-2 at 3. Nor may a state-law presumption be applied to a copyright license in a manner "contrary to federal copyright policy," under which "copyright licenses are assumed to prohibit any use not authorized." *S.O.S., Inc.*, 886 F.2d at 1088. Although a court may interpret a license under state law, "the license must be construed in accordance with the purposes underlying federal copyright law," "chief among the[m] . . . the protection of the [owner's] rights." *Id.* Here, however, the district court's reliance on Georgia's disfavor of conditions undermined this purpose, rendering an explicit numerical limitation on the scope of the license unenforceable in copyright, so that a licensee who paid for only a set number of devices may reproduce CA's software on an unlimited number of devices and answer only in contract.

### B. The Order Forms' payment provision confirms that Delta's use rights were conditioned on what it purchased.

The payment provision supplies a second and independent basis for the same conclusion. The construction the district court adopted cannot be squared with the judgment it entered.

1. <u>The district court correctly construed the Order Forms to expressly condition Delta's use rights on timely payment.</u>

Each Order Form provides that Delta's "[f]ailure to timely remit payment of all amounts set forth in the Payment Schedule" shall, "after written notice by CA and a reasonable opportunity to remit such payment," relieve CA of its support obligations and result in the suspension of "all" of Delta's "subscription use rights . . . until payment is tendered." Doc. 14-3 at 3; Doc. 14-4 at 4. Delta's use rights under the Order Forms are therefore not free-standing promises enforceable only in damages. The parties fixed their own consequence for non-payment, and the consequence they chose was the withdrawal of Delta's authority to use the software rather than a claim for the unpaid amount. Those are express words of defeasance, and their presence removes the predicate for the presumption the district court applied, which governs only instruments containing "no express words of defeasance, forfeiture or

reversion." *Munford*, 258 S.E.2d at 767. Where payment is expressly made the contingency for a right, a condition precedent "must be performed before any right to be created thereby accrues." *Wolverine Ins. Co. v. Sorrough*, 177 S.E.2d 819, 822 (Ga. Ct. App. 1970).

Despite its ultimate conclusion to the contrary, the district court read this provision the same way, holding that "the 2023 Order Form conditions Delta's license to the software on its timely payment for that license," and finding the same conditional language in the 2024 Order Form. Doc. 33 at 12 & n.7. That reading is correct. Language of this kind is the sort of "explicit statement[] that certain events are to be construed as conditions precedent" that creates a condition under Georgia law, *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000), and "[u]ntil" is recognized language of condition, *Krist v. Scholastic, Inc.*, 415 F. Supp. 3d 514, 534 (E.D. Pa. 2019) ("The words 'if,' 'unless,' 'until,' 'on condition that,' and 'except' are all examples of 'unmistakable language of condition.'") (applying New York law). Georgia courts enforce payment-linked language as conditional where the drafting is explicit. *See McDuffie v. Criterion Cas. Co.*, 449 S.E.2d 133, 136 (Ga. Ct. App. 1994) (insurer's intent "that if premium remittance

was dishonored no coverage of any type would exist" made payment "a condition precedent to the existence of coverage"); *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 739 S.E.2d 493, 494–96 (Ga. Ct. App. 2013) (enforcing as a condition precedent a provision under which the subcontractor "would not be paid unless and until [the general contractor] was first paid by the project owner"); *cf. D.I. Corbett Elec., Inc. v. Venture Constr. Co.*, 231 S.E.2d 536, 537 (Ga. Ct. App. 1976) (rejecting the contention that payment-linked terms "merely set a time" for payment). The Order Forms' payment provisions thus constitute conditions.

2. Because the scheduled payments are measured in devices, the payment condition reaches the Authorized Use Limitation.

Payment and permitted device count are two sides of a single term. The scheduled amounts fix the price of a stated number of devices, and the Authorized Use Limitation fixes the number of devices those amounts buy. A provision conditioning all use rights on payment of the scheduled

amounts therefore conditions Delta's use rights on the device count for which it paid.[4]

Delta's contrary inference, which the district court accepted, does not survive the text. Delta argued that because CA "knows how to draft that type of language" but made "no similar express conditional statement regarding the number of devices monitored," the Authorized Use Limitation must be a covenant. Doc. 24 (Reply) at 6. That argument treats the payment provision as though it carved device use out of the condition. It does the opposite. Nothing in the provision distinguishes among devices or preserves use rights for devices Delta never bought. It makes payment the event on which the existence of "all" use rights depends. And Georgia law asks whether the parties conditioned the grant

[4] Delta also contended below that it never accepted the Specific Program Documentation defining "Devices" for the relevant product SKU. The agreements incorporate that definition. Each Order Form provides that "[a]ll capitalized terms not defined in this Order"—such as "Devices"—"shall have the meanings ascribed to them in the [MLA]," and the MLA defines each "Licensed Program" to include "all … documentation" that "embod[ies] or relate[s] to the Licensed Program." Doc. 14-3 at 3; Doc. 14-4 at 3; Doc. 14-2 at 2. The Kyndryl Contract likewise defines "Software" to include "Related Documentation." *See* Doc. 20 (Opposition) at 22–24. In any event, whether Delta was bound by the Specific Program Documentation cannot be resolved against CA on the pleadings because CA plausibly alleged that Delta was bound. *BioHealth*, 706 F. App'x at 524.

on the agreements "when read as a whole," *Pargar*, 730 S.E.2d at 140 n.1, not whether a single sentence repeats particular words of condition.

3. <u>Delta never paid for the excess devices, so its deployment on those devices fell outside the scope of the license.</u>

The consequence in copyright is settled. Where a license grant is subject to a condition precedent and the condition is not performed, "the authority to manufacture and distribute copyrighted material granted in the licensing agreement d[oes] not vest," and the licensee's exploitation is "without the authority of the copyright owner," rendering it "liable for copyright infringement." *Fantastic Fakes*, 661 F.2d at 483.

Nothing turns on whether this provision is classified as a condition precedent or a condition subsequent. Georgia law recognizes both. O.C.G.A. § 13-3-4. And this provision supplies its own consequence for non-performance: Delta holds no "subscription use rights" until payment is tendered. Doc. 14-3 at 3. That the provision operates after notice and an opportunity to cure does not convert it into a promise remediable in damages. It fixes what non-payment costs Delta, and what it costs Delta is the use of the software. Whether that is understood as withholding rights that never accrued or as suspending rights that did, Delta held no

right to use DX NetOps on devices for which it never paid, and use that no license right covers is use beyond the scope of the license. As to devices Delta did pay for, the provision may operate as a suspension of accrued rights. As to devices Delta never paid for, the provision makes clear that Delta had no use rights at all.

This Court's decision in *Jacob Maxwell* is consistent. There, the composer "expressly granted the [licensee] permission to play the song before payment was tendered or recognition received," and thereafter "did not withdraw permission," so the failure to pay breached a promise rather than defeating the license. *Jacob Maxwell*, 110 F.3d at 753–54. The panel was explicit about the converse case. Where payment is "made [a] condition[] precedent to the granted right," then "absent performance of the conditions, the 'license' would not have issued" and the licensee's use "would have violated" the copyright. *Id.* (citing *Fantastic Fakes*, 661 F.2d at 483).

This case is no different. The Authorized Use Limitation permitted Delta to use DX NetOps to manage or monitor 33,288 devices in total, comprising the 9,431 devices authorized by the Order Forms and the 23,857 devices licensed through Kyndryl, CA's partner. Doc. 33 at 2, 10

n.5; Doc. 14-3 at 3. Delta deployed the software on as many as 48,097 devices, 14,809 more than the agreements permitted. Doc. 1 ¶ 35. CA gave Delta written notice on August 20, 2024, that the over-deployment infringed its copyrights and breached the agreements. *Id.* ¶¶ 37–38. The provision's notice predicate was therefore satisfied. On the district court's own reading, use rights under these Order Forms exist only where payment has been "tendered." Doc. 33 at 12. As to the excess deployment, the condition the court identified was never performed, so Delta never held subscription use rights covering that use.

The presumption disfavoring conditions does not reach this provision. *Supra* Part II.A. The district court found this language expressly conditional. Doc. 33 at 12. Having construed the Order Forms to condition Delta's use rights on payment for the licenses it bought, the district court could not simultaneously hold that Delta held licenses to use the software on unauthorized devices for which it did not pay. The construction the court adopted and the judgment it entered cannot both stand.

### III. Dismissal on the Pleadings Was Independently Erroneous Because Rule 12(b)(6) Does Not Permit Interpreting Ambiguous Contract Language Against the Pleader

The district court resolved a contested question of contract interpretation against CA on the pleadings, applying a Georgia presumption to language it suggested was ambiguous. Doc. 33 at 12. Rule 12(b)(6) is not a vehicle for choosing between reasonable readings of a contract, and that error requires reversal.

Rule 12(b)(6) tests the sufficiency of the pleading. The rule "is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997). Georgia contract interpretation proceeds in three steps. *Tims*, 935 F.3d at 1237. The court first asks whether the contract language is clear and unambiguous, and applies its plain meaning if it is. *Id.* If the language is unclear, the court proceeds to step two and attempts to resolve the ambiguity using Georgia's canons of construction. *Id.* If the canons do not resolve it, the court proceeds to step three, "where the parties' intent becomes a question of fact for the jury." *Id.* A contract that "contains provisions susceptible of more than one reasonable interpretation" is

"uncertain of meaning or expression and, thus, ambiguous." *Ga.-Pac. Corp. v. Lieberam*, 959 F.2d 901, 905 (11th Cir. 1992) (quoting *U.S. Fid. & Guar. Co. v. Gillis*, 296 S.E.2d 253, 255 (Ga. Ct. App. 1982)). Applying that framework, *Tims* reversed a Rule 12(b)(6) dismissal because the agreements remained ambiguous after both "the plain language of the contracts" and "the Georgia canons of construction," so that the district court "therefore erred in dismissing Tims's claim for breach of contract." 935 F.3d at 1242.[5]

The order below never made the finding that step one requires. The district court did not hold that the Order Forms clearly and unambiguously state the Authorized Use Limitation as a covenant. Instead, it held that the "governed by" and "subject to" language "simply acknowledges that there *are* terms and conditions, not that the Authorized Use Limitation is one or the other." Doc. 33 at 11–12. If the

[5] *Ausborn*, the authority the district court cited for resolving contract interpretation at the pleading stage, Order at 13, is not to the contrary. *Ausborn* construed policy language that the court found "clear, unambiguous, and capable of only one reasonable interpretation." *Ausborn v. Ill. Union Ins. Co.*, 2024 WL 1896414, at *2 (N.D. Ga. Mar. 29, 2024) (quoting *Ainsworth v. Perreault*, 563 S.E.2d 135, 140–41 (Ga. Ct. App. 2002)), *aff'd*, 2024 WL 4976324 (11th Cir. Dec. 4, 2024). The district court made no such finding here.

court itself could not place the language in one category or the other, it should have determined that the language is susceptible of more than one reasonable interpretation and proceeded to step two: attempting to resolve the ambiguity using Georgia's canons of construction. Under *Tims*, the canons of construction will justify dismissal only where they leave the contract capable of a single reasonable reading. But rather than using Georgia's canons of construction to resolve the ambiguity, the district court applied Georgia's presumption that conditions precedent are disfavored. *Id.* A presumption does not render a contract capable of a single reasonable reading. It presupposes a tie and then selects one. Resolving that contest against the pleader, before any record exists, inverts Rule 12(b)(6).

Had the district court applied the canons rather than the presumption, they would have pointed the other way. The whole-contract canon of O.C.G.A. § 13-2-2(4) requires that every provision be given effect, and Georgia courts have used that canon to construe ambiguous language as creating a condition where the alternative would leave a clause with nothing to do. *See Emanuel Tractor Sales*, 571 S.E.2d at 155–56; *Sheridan*, 554 S.E.2d at 299, 300–01; *supra* Part II.A. At the very

least, the canons did not leave the agreements capable of only the single reading the district court adopted.

The presumption the district court substituted for the canons could not have supplied the tie-breaker in any event because the rationale that gives that presumption its force is absent here. Georgia's preference for covenants over conditions is anti-forfeiture in origin. It rests on O.C.G.A. § 44-6-41, under which "[t]he law favors conditions to be subsequent rather than precedent and to be remediable by damages rather than by forfeiture." *Fulton Cnty.*, 388 S.E.2d at 918; *accord Sheridan*, 554 S.E.2d at 300. The presumption exists, in other words, to keep a doubtful reading from working a forfeiture. Where no forfeiture is in prospect, the presumption has no work to do. As explained above, construing the Authorized Use Limitation as a condition forfeits nothing: Delta never paid for the 14,809 excess devices and so never acquired any use right in them to lose. *Supra* Part II.B; *Dillard*, 44 Ga. at 123. A court may not borrow the weight of an anti-forfeiture presumption to resolve an ambiguity in a case that presents no forfeiture—least of all against the pleader, on the pleadings, and without a record.

As explained above, the parties' agreements contain conditional language throughout, and the payment provision confirms that the parties tied Delta's use rights to what it purchased. *Supra* Part II. CA's reading of those agreements is at a minimum a reasonable one, and a reasonable reading may not be rejected on the pleadings. *See BioHealth*, 706 F. App'x at 524 ("[t]here is at least ambiguity on this point, and that alone is sufficient to render discovery into extrinsic evidence essential before the contract can be definitively interpreted"); Doc. 20 at 16, 25 (raising this rule below). The district court's judgment should be reversed for this additional reason.

## IV. At a Minimum, the Court Should Vacate the District Court's Dismissal with Prejudice

Even if this Court were to sustain the district court's construction of the agreements, the dismissal with prejudice should not stand. The district court declined to consider CA's request for leave to amend. *See* Doc. 33 at 13 n.8. Given the nature of the district court's order and the context in which it was issued, that was error.

CA's first and only pleading was dismissed with prejudice based on the district court's construction of contract language it suggested was ambiguous without the benefit of discovery. *See* Doc. 33. The district

court entered final judgment the same day it entered the dismissal order. *See* Doc. 33, 34. CA thus had no opportunity to amend its pleading to address the district court's construction, and no meaningful opportunity to seek leave to do so by written motion before final judgment was entered. Nor did the district court determine that further amendment would be futile. *See* Doc. 33 at 13. Thus, if this Court identifies a deficiency in CA's allegations that justifies dismissal, the Court should vacate the district court's dismissal with prejudice and remand to permit CA to seek leave to amend in the district court.

## CONCLUSION

For all these reasons, the Court should reverse the judgment of the district court and remand the case for further proceedings. At minimum, the Court should vacate the district court's dismissal with prejudice and remand the case with instructions to permit CA to seek leave to amend its Complaint.

Respectfully submitted,

*/s/ Alison L. Plessman*
Alison L. Plessman
Hueston Hennigan LLP
523 W 6th Street, Suite 400
Los Angeles, CA 90014

(213) 788-4542 |
aplessman@hueston.com

Michael A. Caplan
Georgia Bar No. 601039
Ashley C. Brown
Georgia Bar No. 287373
Erin M. Victoria
Georgia Bar No. 285342
CAPLAN COBB LLC
75 14th Street, NE, Suite 2700
Atlanta, Georgia 30309
Phone: 404.596.5600
mcaplan@caplancobb.com
abrown@caplancobb.com
evictoria@caplancobb.com

*Counsel for Plaintiff-Appellant CA, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,585 words, excluding the parts exempted by Rule 32(f).

2. This brief complies with the typeface and type-style requirements of Rule 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Justin M. Greer*
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on August 20, 2026, I electronically filed the foregoing Brief of Appellant with the Clerk of the Court using the CM/ECF system, which will serve a notice of electronic filing on all counsel of record.

*/s/ Alison L. Plessman*
*Counsel for Plaintiff-Appellant*